IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW HAMPSHIRE, )<br> )<br> Plaintiff, )<br> )<br>v. )<br> )<br>ERIC HOLDER, in his official capacity )<br>as Attorney General of the United States, )<br>*et al.*, )<br> )<br> Defendants. )<br>_____)| Civil Action No. 12-01854<br> (EGS-TBG-RMC) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO HEILEMANN'S MOTION TO INTERVENE**

**I. Introduction and Background**

In this civil action under Section 4 of the Voting Rights Act of 1965, 42 U.S.C. § 1973b, the State of New Hampshire seeks a declaratory judgment of exemption, commonly known as "bailout," for ten covered political subdivisions from the federal preclearance requirements of Section 5.[1]

Bailout under Section 4(a) is intended to remove a covered jurisdiction from Section 5 oversight, and to relieve it of the statute's obligations, where the jurisdiction is demonstrably free of discrimination affecting voting on account of race or color or membership in a language minority group, and has been so for ten years or more. 42 U.S.C. § 1973b(a). The Voting Rights Act's bailout standard was liberalized in 1982 to

---

[1] A listing of the ten covered political subunits in New Hampshire may be found at http://www.justice.gov/crt/about/vot/sec_5/covered.php.  While the State is not a covered jurisdiction under Section 5, the State is nevertheless required to obtain Section 5 preclearance of all voting changes it enacts or administers, insofar as those changes affect voters in the ten covered political subunits.

ease the path to termination of Section 5 coverage where its continuation would serve no purpose. See Paul F. Hancock and Lora L. Tredway, "The Bailout Standard of the Voting Rights Act: An Incentive to End Discrimination," 17 Urb. L.J. 379 (1985).

New Hampshire is quintessentially such a jurisdiction. It has fully complied with the statutory conditions necessary to establish bailout eligibility. The State has provided the United States with extensive "objective and compelling evidence," and the Government has notified the State that, "based upon a showing of objective and compelling evidence by the plaintiff, and upon investigation, [it is] satisfied that the State or political subdivision has complied with the requirements of subsection (a)(1) of this section." See 42 U.S.C. 1973b(a)(9). Accordingly, New Hampshire expects that the parties to this action will submit to the Court in the very near future a joint motion for entry of a consent judgment and decree, along with a proposed consent judgment and decree granting the State its requested bailout.

An individual named Peter Heilemann, represented by the Center for Individual Rights ("CIR"), an organization that has publicly stated its desire to strike down the Voting Rights Act's special provisions,[2] has moved to intervene in New Hampshire's

---

[2] According to CIR's website, "CIR is pressing for Section 5 to be struck down in its entirety[.]" Center for Individual Rights website, http://www.cir-usa.org/updates/index.html#nhamp (last visited Dec. 10, 2012). See also Complaint at 2, ¶ 1, *Laroque v. Holder* (D.D.C., complaint filed April 7, 2010) ("[t]his is an action challenging the constitutionality of Section 5 of the Voting Rights Act of 1965, as amended in 2006"); petition for *cert. sub nom. Nix v. Holder*, No. 12-81 (U.S., filed July 20, 2012), *cert. denied*, 2012 WL 2955934 (Nov. 13, 2012). CIR's attempt to intervene in the New Hampshire case follows the United States Supreme Court's denial of *cert* in *Laroque*, its own constitutional challenge to Section 5. The Supreme Court instead chose to review a different case with different counsel. *Shelby County, Ala. v. Holder*, 679 F.3d 848 (D.C. Cir. 2012), *cert. granted*, No. 12-96 (U.S. Nov. 9, 2012). CIR's bid for Supreme Court review in *Laroque* failed after this Court rejected its claims, and the Justice Department reconsidered and withdrew an earlier objection to a change in election method in the affected jurisdiction, Kinston, North Carolina.

bailout case as of right under Fed. R. Civ. P. 24(a) and 42 U.S.C. §1973b. The motion alleges that Mr. Heilemann, a registered voter in New Hampshire, is "aggrieved" simply because the State of New Hampshire is endeavoring to terminate Section 5 coverage. As explained below, the proposed intervenor is not "aggrieved" by New Hampshire's bailout efforts under any reasonable interpretation of the word, since the State and its political subunits are fully eligible for bailout and a bailout will not affect his voting rights in any way. For the reasons set forth in detail below, he is not entitled to intervene, either of right under Rule 24(a) or by leave of Court under Rule 24(b).

**II.    Discussion**

    **A.    The movant is not an "aggrieved person" entitled to intervene by Section 4**

We start with the movant's supposed statutory entitlement to intervene under Rule 24(a)(1). In its 1975 amendments to the Voting Rights Act, Congress extended to "aggrieved persons" the right to bring Section 5 enforcement suits. 42 U.S.C. §1973b(a) (note on 1975 amendments). Mr. Heilemann claims he is "aggrieved" by the State's effort to terminate its Section 5 coverage. He says that he "receives the benefit of [Section 5] because every statewide law effecting any change in voting in any of the [c]overed [t]owns must be precleared" and that he would be "deprived of the [statute's] protection" if New Hampshire were permitted to bail out. Memorandum in Support of Motion to Intervene (Doc. 6) at 4; see also Heilemann Afft. (Doc. 5-2) at 2, ¶ 3 (expressing "belie[f] that the preclearance process is beneficial").

However, Mr. Heilemann does not allege, nor does any basis exist for the Court to infer, any denial or impairment of his own voting rights. He utters not a word to the effect: (a) that he is a member of a racial or language minority group protected by the

3

Voting Rights Act; (b) that he is a resident of one of the ten New Hampshire towns or townships covered under Section 5; (c) that any voting practice or procedure change, enacted anywhere in New Hampshire since the start of its Section 5 coverage in 1972, has harmed him in any manner, or that any such change within the last ten years has failed to receive preclearance; or (d) that any such voting-related change has a purpose or effect prohibited by Section 5 and should not have been precleared.[3]

The cold fact is that this movant and the organization representing him desire to destroy Section 5, not to seek its protection.[4] The movant and his litigation sponsor apparently believe that New Hampshire's bailout will somehow hurt the cause of those who seek to have Section 5 invalidated in the pending constitutional challenge cited in *Shelby County, Ala. v. Holder*, No. 12-96 (U.S., *cert*. granted Nov. 9, 2012).[5] The

---

[3] Because Mr. Heilemann cannot claim direct impairment of his voting rights, he claims support for his "person aggrieved" status under the rationale of *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209 (1972), which gave "aggrieved persons" standing to sue under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq*. The movant's reliance on *Trafficante* for his own standing is sorely misplaced: *Trafficante* itself opined that Title VII "person aggrieved" standing could extend, at most, to the limit of Article III standing, not beyond it; and *Trafficante* Title VII "person aggrieved" standards have been held *stricter* than Article III standing requirements. *Thompson v. North American Stainless LP*, 131 S. Ct. 863, 870 (2011) (adopting a "zone of interest" test for statutory "person aggrieved" status, which would be unsatisfied if the interests at issue "are so . . . inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit"), citing *Clarke v. Securities Industry Assn.,* 479 U.S. 388, 399–400 (1987). Try as he might, Mr. Heilemann cannot contort his strategic interest in Section 5's extinguishment into a white-hat devotion to the statute's anti-discrimination purpose.

[4] Public interest litigation organizations' recruitment of clients is and should be protected by the First Amendment, *In re Primus*, 436 U.S. 412 (1978), but that protection does not automatically give a recruited client Article III standing or any advantage under Rule 24.

[5] See Samuel Bagenstos, "The Bizarre Opposition to New Hampshire's Voting Rights Act Bailout Suit," Prawfsblawg, Dec. 10, 2012, *available at* http://prawfsblawg.blogs.com/prawfsblawg/2012/12/the-bizarre-opposition-to-new-hampshires-voting-rights-act-bailout-suit.html (last visited December 17, 2012). Now a professor at the

4

movant's goal in intervening here, then, is not to protect his voting rights, or even to assert Voting Rights Act protections for others. Rather, his aim is more likely an effort to obstruct and delay New Hampshire's bailout action to bolster claims before the Supreme Court in the *Shelby County* case that Section 5 is unduly burdensome for covered jurisdictions and that bailout from coverage is unworkable. Since this action is New Hampshire's request to terminate its federal preclearance obligations for itself and those of its ten covered political subdivisions, it is ironic, to say the least, that those opposed to the preclearance process on burdensomeness grounds are attempting to intervene here to maintain the preclearance regime in New Hampshire. This suit in no way affects movant's right to contend, either as *amicus curiae* in *Shelby County* or in some future case, that Section 5 is unconstitutional. In other words, Mr. Heilemann's "interest" relates to the *Shelby County* case, and should be addressed to that Court, not this one.

Hovering over these dynamics is an inescapable fact: New Hampshire's demographics make it virtually impossible for voting changes to have a purpose or effect prohibited by Section 5. The State's total 2010 Census population of 1,316,470 is approximately 95 percent non-Hispanic white in racial composition. That proportion has remained essentially unchanged since Section 5 coverage of New Hampshire began in 1972. The only one of the State's ten covered towns with more than a 5% minority share of total 2010 Census population is Pinkham's Grant, which has a total population of 9 persons, of whom 6 are white. Those nearly all-white population proportions have likewise remained unchanged since before coverage began forty years ago. Neither the State nor any of its ten covered political subdivisions has ever drawn a Section 5

---

University of Michigan Law School, Mr. Bagenstos is a former chief deputy assistant attorney general in the Justice Department's Civil Rights Division.

objection to any change affecting voting, nor has this Court ever denied a declaratory judgment concerning any voting change that New Hampshire or its covered towns enacted or administered.  And the State and its ten covered political subunits have requested and obtained preclearance of every known voting change that has occurred within at least the last ten years.

      B.      **The proposed intervenor's arguments against bailout are meritless and add nothing to these proceedings**

Mr. Heilemann's intervention papers claims he wants to intervene to make a contention that he believes neither original party will raise.  See Fed. R. Civ. P. 24(a)(2) (suggesting intervention appropriate where existing parties do not adequately represent intervenor's interest).  Taken in the light most favorable to him, Mr. Heilemann's contention is that the Justice Department is handling bailout requests more leniently than it should in an effort to defeat the pending constitutional challenge to Section 5 in the *Shelby County* case.  Memorandum in Support of Motion to Intervene at 8.  Any such suggestion is incorrect.  New Hampshire has not evaded the statute in any sense, and the Attorney General is handling the present bailout request with the common sense and flexibility that Congress intended him to apply—*and that he has applied in prior bailout actions*.

During the course of New Hampshire's pre-filing review of its Section 5 compliance, and the Attorney General's own investigation of New Hampshire's eligibility for bailout, it was discovered that certain previously implemented voting changes had not been submitted for preclearance.   Any failure to submit such changes was "inadvertent and not the product of any discriminatory purpose or an intent to evade

6

the Act." Complaint at ¶ 31.  The State voluntarily and promptly made every submission under Section 5, and all of the submitted voting changes have now been precleared.

Contrary to the movant's arguments for intervention, this does not preclude bailout.  It is true that the bailout provision states that "no declaratory judgment shall issue" if the covered jurisdiction seeking bailout, or governmental units within its territory, have implemented unsubmitted changes during the preceding ten years, or even violated constitutional or statutory prohibitions on racial discrimination in voting.  42 U.S.C. §1973b(a)(3).  But the statute then makes an immediate, explicit exception for any such incidents, regardless of their number, that the bailout applicant *establishes . . . were trivial, were promptly corrected, and were not repeated.*" 42 U.S.C. §1973b(a)(3) (emphasis added).  In other words, a covered jurisdiction may obtain a bailout under the Act, even if it has substantively "violated constitutional or statutory prohibitions on racial discrimination in voting", as long as it meets the burden to show in a bailout action that "such violations were trivial, were promptly corrected, and were not repeated." *Id*.

That is a far cry from this case.  There has not been a single determination that New Hampshire has violated any provision of the federal Constitution or laws with respect to discrimination in voting on account of race, color or membership in a language minority group.  Nor has there been a single determination, since Section 5 coverage began for New Hampshire in 1972, that any of the hundreds of voting changes it implemented during that time was purposefully discriminatory or would have a racially discriminatory effect.  All that can be said is that as it prepared to ask for bailout, New Hampshire discovered that a number of its voting changes over the years had not been

7

submitted for preclearance and promptly submitted them, either when it made that determination on its own or upon being so advised by the Attorney General.

Moreover, Congress has made clear that jurisdictions seeking a bailout should not be precluded from doing so if they can show, at the time bailout is sought, that they have taken corrective action without delay to remedy any after-discovered minor or inadvertent infractions. Congress created the bailout process as an incentive for covered jurisdictions to end voting discrimination and achieve full compliance with the Act, and to eliminate any voting problems or barriers that might exist for minority voters. The Senate Report supporting the extension of Section 5 in 1982 illustrated the bailout scheme's intent with specific examples: inadvertent turnaways of minority voters from the polls, if promptly corrected and not repeated, would not bar bailout, whereas physical attacks on voters or pollwatchers by or with the acquiescence of public officials would bar bailout regardless of remedial action and non-repetition. S. Rep. No. 97-417, 97th Cong., 2d Sess. 53 (1982), *reprinted in* 1982 U.S. Code Cong. & Admin. News 231 (Senate Judiciary Committee report on the 1982 amendments to the Voting Rights Act) ("Senate Report"); *Thornburg v. Gingles*, 478 U.S. 30, 43 n.7 (1986) (treating the Senate Report as an authoritative explication of Congress' intent in the 1982 amendments to the Act). New Hampshire's inadvertently late-submitted voting changes never had a whiff of the discriminatory odor of the Senate Report's examples. Not only have all of these changes been precleared, but the State's demographics make it highly unlikely, as they always have, that any voting change could carry a racially discriminatory purpose or effect.[6]

---

[6] Contrary to the would-be intervenor's misleading characterization (see Intervenor's Motion to Dismiss at pp. 2-3, submitted as an attachment to the motion to intervene), Shelby County,

Contrary to the would-be intervenor's assertions, the Department of Justice for many years has used a "common-sense" application of the bailout provision, allowing jurisdictions that had inadvertently failed to make timely preclearance submissions to go back and make such submissions at the time they sought bailout. Indeed, in many bailout actions in this Court over the years, three-judge panels have granted bailout to covered jurisdictions despite the presence of previously unsubmitted voting changes, even implemented ones, as long as preclearance was sought and obtained before the proposed bailout judgment was filed. See, *e.g., Shenandoah County, Va. v. Reno*, No. 99-992 (Consent Judgment and Decree, October 15, 1999); *Rockingham County, Va. v. Ashcroft*, No. 02-391 (Consent Judgment and Decree, May 21, 2002); *Warren County, Va. v. Ashcroft*, No. 02-1736 (Consent Judgment and Decree, November 21, 2002); *Pulaski County, Va. v. Gonzales*, No. 05-1265 (Consent Judgment and Decree, September 25, 2005); *Greene County, Va. v. Ashcroft*, No. 05-1885 (Consent Judgment and Decree, January 19, 2004); *Augusta County, Va. v. Gonzales*, No. 05-1885 (Consent Judgment and Decree, October 30, 2005); *Kings Mountain, N.C. v. Holder*, No. 10-1153 (Consent Judgment and Decree, October 22, 2010); and *Merced County, Calif. v. Holder*, No. 12-1153 (Consent Judgment and Decree, August 31, 2012).[7]

---

Alabama, was ineligible to bail out because, among other things, one of its political subdivisions had drawn at least one Section 5 *objection* within the preceding ten years. *Shelby County v. Holder*, 811 F. Supp. 2d 424, 446 & n.6 (D.D.C. 2011), *aff'd*, 679 F.3d 848 (D.C. Cir. 2012). The distinction between past Section 5 *objections* on the one hand, and *late-submitted changes that were found unobjectionable* on the other, makes a world of difference to Section 5 enforcement, and places Shelby County in an entirely different category from New Hampshire. See 42 U.S.C. §1973b(a)(3); Senate Report at 53, *reprinted in* 1982 U.S. Code Cong. & Admin. News 231.

[7] The bailout consent judgment and decrees for each of these cases may be found here: http://www.justice.gov/crt/about/vot/misc/sec_4.php.

Particularly salient is that Congress itself, when it last renewed Section 5 in 2006, was made specifically aware of the Attorney General's long-standing practice of consenting to bailouts by covered jurisdictions with previously unsubmitted voting changes, where the omissions were inadvertent and the jurisdiction promptly submitted any changes for preclearance. See House Judiciary Subcommittee on the Constitution, Oversight Hearing on the Special Provisions of the Voting Rights Act, Oct. 20, 2005 (testimony of J. Gerald Hebert) ("There are several reasons why demonstrating § 5 compliance should be retained as part of the bailout formula. First, DOJ will allow a jurisdiction that inadvertently failed to submit a few changes to submit those changes for preclearance at the time bailout is sought, and thus the preclearance is *nunc pro tunc*. Second, the legislative history shows that Congress thought that for changes which 'are really *de minimis*,' the 'courts and Department of Justice have used and will continue to use common sense.' While the process of going back and making these § 5 submissions can be time-consuming, it ensures full compliance with the Act and is faithful to the language and spirit of the law."). In the face of such testimony, Congress chose to leave the bailout provisions unchanged in the 2006 reauthorization of Section 5, and in doing so left intact the Attorney General's common-sense approach to bailouts, even though it made other important amendments to the statute specifically to respond to court rulings. See H.R. Rep. No. 109-478, 109th Cong., 2d Sess. 2 (2006), *reprinted in* 2006 U.S. Code Cong. & Admin. News 618 (addressing legislative responses to *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000), and *Georgia v. Ashcroft*, 539 U.S. 461 (2003)).

One further point should be made about intervention in Section 5 declaratory judgment proceedings: virtually all cases in which this Court has granted intervention are

cases in which a State or political subdivision seeks judicial preclearance, not bailout. Judicial preclearance cases, on the other hand, usually draw intervenors and a number of them. By contrast, in the several dozen bailout cases this Court has heard over the years, intervention was sought in only one, and the circumstances in that one case are far different from those here.[8] It may well be the case that there have been no interventions in bailout cases over the years because the United States Attorney General has not opposed a bailout lawsuit in this Court since the 1982 Amendments to the Voting Rights Act were enacted, and because the Attorney General is required by law to conduct an independent investigation to determine if the State or political subdivision seeking bailout has complied with the bailout requirements and the Attorney General's independent investigation includes input from minority voters in the jurisdiction.

In preclearance cases, the Court's goal is to obtain unique local perspectives on the proposed voting change at issue, especially from voters directly affected by it who are opposed to it. See, *e.g., Texas v. United States*, 831 F. Supp. 2d 244 (D.D.C. 2011) (Section 5 review of statewide redistricting), *jurisdictional statement filed,* 81 U.S.L.W. 3233 (Oct 19, 2012) (No. 12-496); *Texas v. Holder*, ___ F. Supp. 2d ___, 2012 WL 3743676 (D.D.C. 2012) (Section 5 review of voter ID requirement); *Georgia v. Ashcroft*,

---

[8] The proposed intervenor states that "[t]his Court has permitted intervention in cases by voters involving a request for a bailout even when the Attorney General opposed bailout." Motion to Intervene at 3-4, citing *Northwest Austin Municipal Utility Dist. v. Gonzales*, Civ. No. 06-01384-PLF-EGS-DST (D.D.C., order dated November 9, 2006) (Doc. 33). First, it is only one case, not "cases". Second, in that one case, *Northwest Austin*, the Government did not "oppose" bailout; rather, it believed when suit was filed that the plaintiff utility district did not meet the definition of "political subdivision" eligible for bailout under the statute, which meant that the Court had to reach the question of Section 5's constitutionality. Intervenors, who included minority voting rights advocates and other Texas political subdivisions, all supported the Government's view, both on eligibility for bailout and on the constitutional question. On appeal, the Supreme Court avoided the constitutional question by reinterpreting the term "political subdivision" to make bailout available to all political subunits in a covered jurisdiction, including utility districts, and the intervenors did not oppose bailout on remand following the Supreme Court's decision.

195 F. Supp. 2d 25 (D.D.C. 2002), *vac'd*, 539 U.S. 461 (2003) (Section 5 review of statewide redistricting).   The same local perspectives can be important in bailout cases too, but here the would-be intervenor not only fails to offer any meaningful local perspective, he fails to identify a single reason to deny the bailout (other than his claim, exposed above as implausible, that he wants to see Section 5 coverage of New Hampshire continued).

      C.    **Even if movant were a "person aggrieved", this would not give movant Article III standing**

Even if the movant is somehow deemed an "aggrieved person" under Section 4 itself, a potential intervenor in this Circuit under Rule 24(a)(1) must still satisfy the same Article III standing requirements as any other claimant.  *Jones v. Prince George's County*, 348 F.3d 1014, 1017 (D.C. Cir. 2003) (requiring all potential intervenors to demonstrate standing in addition to Rule 24 requirements).

Article III standing means more than "standing in": the injury must be "particularized," *i.e.* personal to the claimant, not just complained of in the abstract or on others' behalf.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 & n. 1 (1992) (to have standing, the plaintiff must have suffered a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual way").  Whatever Mr. Heilemann's claims under the Act may be, he cannot show that New Hampshire's bailout would cause "particularized" injury to his voting rights.  See *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 543-544 (1986) (school board member with "no personal stake in the outcome of the litigation" had no standing); cf. *United States v. Hays*, 515 U.S. 737, 744-745 (1995) (private *Shaw* plaintiff who has alleged stigmatic harm affecting all of a jurisdiction's voters, but no facts showing that he

personally was subjected to a racial classification, lacks Article III standing); *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984) (standing to assert "stigmatic injury . . . requires identification of some concrete interest with respect to which respondents are personally subject to discriminatory treatment").

### D. **Permissive intervention must also be denied**

As an apparent afterthought, the movant includes a paragraph on permissive intervention under Rule 24(b).  Memorandum in Support of Motion to Intervene at 9.  However, the severe problems in the would-be intervenor's position, as we have described them above, make permissive intervention even less appropriate, not more, than intervention of right.

"As its name would suggest, permissive intervention is an inherently discretionary enterprise."  *E.E.O.C. v. National Children's Ctr., Inc*., 146 F.3d 1042, 1046 (D.C. Cir. 1998).  A party seeking relief of any kind in the Court's discretion must come with clean hands.  *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (clean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness . . . relative to the matter in which he seeks relief"). The federal courts wholly subscribe to the venerated maxim that he who seeks equity must do equity.  *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 526 (1962); *Myers v. Hurley Motor Co.*, 273 U.S. 18, 26 (1927); *Brown v. Lake Superior Iron Co.*, 134 U.S. 530, 535 (1890); *Willard v. Tayloe*, 75 U.S. (8 Wall.) 557, 574 (1870).

As set forth above, Mr. Heilemann's motion presents two irreconcilable premises: that he favors continuation of Section 5 coverage of his State, and that he desires Section 5 itself to be nullified.  If his application to intervene as of right is rejected, as it should

be for these reasons, the equities of his alternative application to intervene by leave of Court are decidedly not in his favor.

Viewed simply in terms of judicial management of this case if intervention is granted, the problem is the same. "In deciding how to exercise its discretion [to permit a third party to intervene], the Court [may] consider such factors as the nature and extent of the applicant's interests . . . and whether [the proposed intervenor] will significantly contribute [to] the just and equitable adjudication of the legal question presented." *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F.Supp.2d 1, 18 (D.D.C. 2010), citing *H.L. Hayden Co. v. Siemens Med. Sys.*, Inc., 797 F.2d 85, 89 (2d Cir. 1986) (internal quotations omitted). Here, it seems apparent that the movant's "contribution" to the merits of New Hampshire's bailout request will be diminished throughout by his failure to identify any injury whatever to his voting rights, as well as by his desire to strike down the Voting Rights Act's preclearance requirements, not preserve them.

Finally, the bailout provisions of Section 4 state explicitly that "[t]he court shall retain jurisdiction of any action pursuant to this subsection for ten years after judgment and shall reopen the action upon motion of the Attorney General or any aggrieved person alleging that conduct has occurred which, had that conduct occurred during the ten-year periods referred to in this subsection, would have precluded the issuance of a declaratory judgment under this subsection." 42 U.S.C. §1973b(a)(5). If bailout is granted, and if in the future Mr. Heilemann can present this Court with factual evidence of voting discrimination in any of the State's ten political subdivisions, he can move to reopen this case and seek intervention then (assuming he can establish standing as an "aggrieved person"). The availability of this option under the statute, coupled with Mr. Heilemann's

14

failure to show any injury in fact to his or any person's voting rights, also counsels the exercise of this Court's discretion to deny the motion to intervene.

### III.   Conclusion

This suit, involving as it does an exemption from the preclearance provisions, must be handled with respect for two fundamental policies of Section 5: "to shift the advantage of time and inertia from the perpetrators of the evil [of racial discrimination in voting] to its victims," *South Carolina v. Katzenbach*, 383 U.S. 301, 328 (1966), and to afford bailout as a meaningful escape hatch for jurisdictions that are free of voting-related racial discrimination. S. Rep. No. 97-417, at 44-45 (1982), *reprinted in* 1982 U.S. Code Cong. & Admin. News 222-223. Bailout both relieves unnecessary burdens on jurisdictions which Section 5 need not cover, and allows federal authorities to focus their resources on the jurisdictions where Voting Rights Act enforcement is most necessary. The present motion to intervene would turn those policies on their heads, and mock the Court's duty to enforce the statute and the Federal Rules. The motion should be denied.

        Respectfully submitted,

        MICHAEL A. DELANEY
        Attorney General
        MATTHEW MAVROGEORGE
        Assistant Attorney General
        33 Capitol Street
        Concord, NH  03301
        Phone: (603) 271-3658
        Fax: (603) 271-2110

        /s/ J. Gerald Hebert
        J. GERALD HEBERT
        D.C. Bar No. 447676
        191 Somervelle Street, #405
        Alexandria, Virginia 22304
        hebert@voterlaw.com
        (703) 628-4673

        STEPHEN B. PERSHING
        D.C. Bar No. 482580
        1416 E Street, N.E.
        Washington, D.C. 20002
        sbpershing@gmail.com
        (202) 543-4749

        Counsel for Plaintiff

Dated: December 19, 2012

## CERTIFICATE OF SERVICE

  I hereby certify that on this 19th day of December, 2012, I served a copy of the foregoing Memorandum of Plaintiff in Opposition to the Motion to Intervene and Proposed Order by filing the same in this Court's ECF system, which will provide notice to all counsel of record.

        /s/ J. Gerald Hebert
        J. GERALD HEBERT