UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

THE STATE OF NEW HAMPSHIRE,

        Plaintiff,

        v.

ERIC HOLDER, *et ano.*

        Defendants,

and

PETER HEILEMANN,

        Proposed Intervenor-Defendant.
_____

Civil Action No. 12-01854
EGS-TBC-RMC
Three-Judge Court

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

Peter Heilemann submits this reply memorandum of points and authorities in support of his motion, pursuant to Rule 24 of the Federal Rules of Civil Procedure and Local Civil Rule 7(j), to intervene in this action, and in response to the opposition papers submitted by the plaintiff ("Pl. Memo.") and defendants ("Govt. Memo.").

Introduction

The papers opposing Mr. Heilemann's motion to intervene are an odd mix. Rather than focus on the standards for intervention, plaintiff and defendants resort to *ad hominem* attacks – not on Mr. Heilemann, but rather on his attorneys, whose alleged views the parties apparently believe they can attribute to Mr. Heilemann *ipse dixit* – and an imperious defense of a proposed consent decree that was filed shortly after the opposition papers. Confident of its own

righteousness, plaintiff asserts that the motion to intervene would "mock the Court's duty to enforce the statute."  Pl. Memo. 15.

Just the opposite is true.  Plaintiff and defendants mock the statute, for they can contend that New Hampshire is entitled to bailout only by ignoring a key provision of the Voting Rights Act.  Specifically, and as described in greater detail below, Section 4(a)(1)(D) (42 U.S.C. § 1973b(a)(1)(D)) precludes bailout where a covered jurisdiction has implemented changes in voting without preclearance ("Preclearance Violations").  The covered jurisdictions in New Hampshire here have concededly done just that.  The parties try to circumvent that obvious flaw in New Hampshire's case by asserting that Section 4(a)(3) (42 U.S.C. § 1973b(a)(3)) *also* covers Preclearance Violations *and* permits this Court to forgive ones that meet certain requirements of isolation, triviality, and prompt correction (which, they say, are met here).  But if Section 4(a)(3) covers Preclearance Violations, then the Section 4(a)(1)(D)'s prohibition of bailout in the face of Preclearance Violations serves no purpose at all; it is entirely superfluous.  And that is not how any statute, much less one as important as the Voting Rights Act, should be read.  Indeed, this Court has an independent duty to enforce the statute that Congress wrote, regardless of the parties' desire, the Attorney General's past practice, or even whether intervention is granted – which it should be, if only to ensure that a collusive effort to render a section of the Act meaningless is not adopted without the benefit of some argument to the contrary.

As to the motion to intervene itself, the following facts are clear from the opposition papers.  First, neither the United States nor plaintiff represents the interests of those who believe that the statute should be read sensibly and that, when it is, New Hampshire could not be entitled

2

to bailout.  Second, plaintiff and defendants cannot identify *one* case since 1982 in which *any* voter in a state in which preclearance *or* bailout was being contested was *ever* denied intervention.  And this is true even when the voters did not live in the political subdivision covered by Section 5.  The absence of any analogous precedent is telling.  For the reasons set forth in the moving papers, and below, the motion should be granted.

<u>Argument</u>

I.      PLAINTIFF AND DEFENDANTS ERR IN ASSERTING THAT MOVANT
        IS NOT AN "AGGRIEVED PARTY" ENTITLED TO INTERVENTION
        UNDER RULE 24(A)(1)

        The moving papers ("Moving Memo.") demonstrate that Section 4(a)(4) and 4(a)(9) of the Voting Rights Act provide a statutory right to intervene to "aggrieved parties" and that movant is thus entitled to intervention pursuant to Rule 24(a)(1) of the Federal Rules of Civil Procedure.  Moving Memo.  2-4.  None of the other parties contend that movant's efforts to intervene are not "timely" for purposes of Rule 24(a).  Plaintiff and defendants do assert that movant cannot meet the "aggrieved party" standard because he lacks standing and because his own voting rights will not be impaired by a declaratory judgment providing New Hampshire with bailout.  Govt. Memo. 4-11; Pl. Memo. 3-6, 12-13.  These arguments misconstrue the nature of the injury that movant seeks to prevent, and, accordingly, mistakenly conclude that bailout here would not injure him.

A.    <u>Movant Has Standing To Prevent A Procedural Injury</u>

Defendants contend that the "aggrieved party" standard in the Voting Rights Act is tantamount to a requirement that a potential intervenor must meet the standing requirements of Article III.  Govt. Memo. 6.[1]  Both defendants and plaintiff assert that movant's voting rights will not be affected by the outcome of this lawsuit, and that therefore he has no standing and cannot be an "aggrieved party."  These arguments miss the point.  Movant claims that he has a right to the *procedural protections* of Section 5 that themselves are designed to protect his underlying substantive right to non-discrimination in voting.

Section 5 provides a process where by changes in voting laws must be precleared by either the Attorney General or this Court.  A failure to submit a change deprives those affected of a procedural protection *regardless* of whether the process would have resulted in an objection or a denial of declaratory judgment under Section 5.  If New Hampshire is permitted to bail out, Mr. Heilemann will be deprived of that procedural protection.

---

[1]    Plaintiff's position is less clear; it argues both that "aggrieved party" standards are stricter than Article III (Pl. Memo. 4 n.3) and that movant lacks Article III standing even if he does meet the requirements of "aggrieved party" (which it mistakenly refers to as "aggrieved person," Pl. Memo. 12-13), suggesting that Article III might be stricter.  As to the first argument, plaintiff relies on a 2011 Supreme Court opinion that interpreted "person aggrieved" for purposes of Title VII.  Pl. Memo. 4 n.3 (citing *Thompson v. North American Stainless LP*, 131 S. Ct. 863 (2011)).  The legislative history cited by both the Government and movant (Moving Memo. 3) shows that when Congress adopted the phrase "aggrieved party" for the Voting Rights Act, it understood that term in the broad language used in *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972).  (*Trafficante*, it deserves mention, was not, as plaintiff asserts, a Title VII case, but rather a case under the Fair Housing Act.  Pl. Memo. 4 n.3.  *Thompson* did not disturb its holding, only its *dicta* related to Title VII.)  In any event, when Congress creates a procedural right, as described in the text, those entitled to that right meet both Article III and prudential requirements of standing.

4

Courts long have recognized the special nature of procedural rights in the standing context. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.7 (1992) (plurality op.) ("There is much truth to the assertion that 'procedural rights' are special."). Thus, when a federal agency is obligated to create an Environmental Impact Statement, those who could be affected do not need to show that the EIS will result in some change in the project at issue that will benefit them in order to have standing. To the contrary, standing is acknowledged regardless of what the ultimate determination on the project would be. *E.g.*, *Lemon v. Green*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (plaintiff who alleged that Secretary of the Army failed to comply with certain provisions of the National Environmental Policy Act and National Historic Preservation Act that required him to consider the environmental and historic property impact before transferring certain property to developers had standing; "Preparation of an environmental impact statement will never 'force' an agency to change the course of action it proposes. The idea behind NEPA is that if the agency's eyes are open to the environmental consequences of its actions and if it considers options that entail less environmental damage, it may be persuaded to alter what it proposes."); *National Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 6 (D.C. Cir. 2005) (plaintiffs who allege that the Assistant Secretary of the Interior failed to follow the requirement of the Clean Air Act when he unreasonably determined, and told relevant Montana state officials, that a coal-fired electric generating plant would not adversely affect visibility in Yellowstone Parks and the UL Bend Wilderness Area, had standing; "'A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered.'") (quoting *Sugar Cane Growers Corp.*

5

*v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002)).

B.        The Parties' Arguments Regarding Standing Are Misplaced

Thus, the parties' arguments that movant's "voting rights" will not be affected by this

lawsuit, or that he has not been personally discriminated against by New Hampshire, are

irrelevant to the question of standing.  The parties in cases like *United States v. Hays*, 515 U.S.

737 (1995) (Govt. Memo. 8) did not claim that they were being deprived of a procedural

protection, but rather that they were themselves being discriminated against with respect to their

right to vote.  Similarly wrong are plaintiff's apparent standing requirements that movant show

that he has been harmed by some voting practice in the past or that such voting practice had an

improper purpose or effect.  Pl. Memo. 4.[2]

Defendants suggest that movant does not get any procedural protection from Section 5

because the Attorney General reviews statewide laws to determine "whether there is a

discriminatory purpose or effect with regard *only* to the covered jurisdictions within that

state . . . . "  Govt. Memo. 10.  Thus, "[m]ovant benefits no more from the Section 5 coverage in

other parts of New Hampshire than he does from Section 5 coverage in Louisiana."  *Id.* 9.  This

makes no sense.  Even if it were possible to assess a statewide law for discriminatory effect in

only part of the state, it is not possible to assess a statewide law for discriminatory purpose

_____

[2]        Plaintiff's additional contention that movant lacks standing because he is not "a member
of a racial or language minority group protected by the Voting Rights Act" (Pl.  Memo. 3-4) is
not only wrong about standing, but also displays an egregious misunderstanding of the Act.  *Cf.
United States v. Brown*, 494 F. Supp. 2d 440, 444 (S.D. Miss. 2007) ("Section 2 provides no less
protection to white voters than any other class of voters."), *aff'd*, 561 F.3d 420 (5th Cir. 2009).

6

existing in only part of a state.  A law passed by a state legislature, or other competent statewide body, was either passed with a discriminatory intent or it was not.  And any assessment or review of a discriminatory purpose is a procedure that will necessarily provide some protection for everyone in the state, not just those in the covered jurisdictions.  Movant is unaware of New Hampshire ever implementing any statewide voting law in New Hampshire in two stages, first in the non-covered parts of the state and only later in the covered parts.  New Hampshire itself has not provided any example of such two-tiered implementation.

In the preclearance context, this Court recently permitted intervention of an individual who did not live in any of the covered counties (Collier, Hardee, Hendry, Hillsborough, and Monroe) in Florida.  *Florida v. United States*, Slip op., D.D.C. Civ No. 11-01428 (CKK)(MG)(ESH) (Oct. 19, 2011) (Doc. No. 42) (granting intervention to, *inter alia*, Ion Sancho); Amended Motion to Intervene in *Florida v. United States* (Doc. No. 13) 4 (Sancho "is the Supervisor of Elections of Leon County, Florida"); 28 C.F.R. Part 51, Appendix (listing covered jurisdictions).

Similarly, defendants' argument that movant complains only of a "generalized grievance" is wrong.  Govt. Memo. 11.  As the Supreme Court has explained, the Article III concern is with *abstract* injuries, not ones that are specific but are shared by a wide number of people.  *Fed'l Election Comm'n v. Akins*, 524 U.S. 11, 23-25 (1998).  In *Akins*, the plaintiffs complained of being deprived of information by the Federal Election Commission it believed the FEC was obligated to make public.  The Court acknowledged that this injury was shared by the public at large, but concluded that "the fact that it is widely shared does not deprive Congress of

7

constitutional power to authorize its vindication in the federal courts." *Id.* at 25.  Here, movant

will lose a specific procedural protection afforded by the law: preclearance review of statewide

laws affecting voting.  The fact that other voters in New Hampshire will also lose that protection

-- just as the fact that all other citizens could not obtain the information sought in *Akins* – does

not affect the analysis under Article III.

The procedural protections of Section 5 are designed to protect voters' substantive right

to non-discriminatory voting laws, just as the procedural protections in *Akins* were designed to

protect voters' substantive right to fully-informed voting.  Article III requires no more.

II.    THE PARTIES ERR IN ASSERTING THAT MOVANT CANNOT MEET THE
       REQUIREMENTS FOR INTERVENTION UNDER RULE 24(A)(2)

The moving papers demonstrate that Mr. Heilemann also is entitled to intervention as of

right under Rule 24(a)(2).  Moving Memo. 4-9.  Defendants rely almost entirely on their standing

argument in response, with a short reference to the Attorney General's broad role in representing

the public interest in an effort to refute movant's showing that defendants do not adequately

represent his interest.  Govt. Memo. 13.  Plaintiff resorts to insisting that its (and the Attorney

General's) interpretation of the statute is correct, and that, presumably, movant must be

adequately represented.  These arguments are misguided.

A.    Defendants' Adequacy Of Representation Argument Misstates The Law

As to defendants' arguments, movant already has addressed the standing issue.  The

additional assertion that the Attorney General is "charged with protecting the public interest in

eradicating racial discrimination in voting" and therefore must adequately represent movant (Govt. Memo. 13) proves far too much.  If the Attorney General's statutory role were sufficient to preclude intervention as of right, then no one could *ever* intervene in a voting rights case under Rule 24(a)(2) when the Attorney General is a party.  That is not the law.  *N.C. State Bd. of Elections v. United States*, Slip op., D.D.C. Civ. No. 02-1174 (D.D.C. June 25, 2002); *Florida v. United States*, Slip ops., D.D.C. Civ. No. 02-0941 (D.D.C. May 28, 2002 and June 4, 2002); *Georgia v. Ashcroft*, Slip ops., D.D.C. Civ. No. 01-2111 (D.D.C. Jan. 10, 2002 and Jan. 30, 2002), *aff'd in relevant part*, 539 U.S. 461, 476-77 (2003) (holding that the District Court did not abuse its discretion in concluding that the intervenors were not adequately represented by existing parties, including the Attorney General).  The fact that Congress chose to include intervention by statutory right in bailout proceedings demonstrates that it did not believe that the Attorney General could always represent the interests of every member of the public there.  And here, defendants have ignored a section of the statute designed for the benefit of the public.

     B.     The Parties' Interpretation Of Section 4 Is Wrong Because It Renders A Part Of That Section Superfluous

Plaintiff's argument is more substantive.  It asserts that intervention is improper because movant's statutory argument is just wrong.  Pl. Memo. 6-10.  Specifically, it asserts that although the statute precludes bailout when there have been Preclearance Violations, as there have been here, "the statute then makes an immediate, explicit exception for any such incidents, regardless of their number, that the bailout applicant *establishes . . . were trivial, were promptly corrected, and were not repeated*."  Pl. Memo. 7 (citing 42 U.S.C. § 1973b(a)(3)) (emphasis in original).

Defendants make the same substantive argument in their discussion of permissive intervention. Govt. Memo. 16.

At the outset, it is inappropriate to address whether movant's substantive argument is correct on this motion to intervene. *E.g.*, *Brennan v. New York City Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001) ("[E]xcept for allegations frivolous on their face, an application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention . . . ") (quoting *Oneida Indian Nation v. New York*, 732 F.2d 261, 265 (2d Cir. 1984) (brackets as in *Brennan*). Movant's statutory argument is not frivolous.

To the contrary, it is the parties' argument here that is meritless. Both parties cite Section 4(a)(3), and entirely ignore Section 4(a)(1)(D). And they ignore it despite the fact that movant cited it prominently in the proposed motion to dismiss that accompanied his motion to intervene. Section 4(a)(1)(D) provides, in relevant part:

> A declaratory judgment under this section shall issue only if [this] court determines that during the ten years preceding the filing of the action, and during the pendency of such action . . . such State or political subdivision and all governmental units within its territory have complied with [Section 5], including compliance with the requirement that no change covered by [Section 5] has been enforced without preclearance under [Section 5], . . .

42 U.S.C. § 1973b(a)(1)(D).[3]  Thus, it is just disingenuous for plaintiff to assert that "the statute" has "an immediate, explicit exception" (Pl. Memo. 7) for any violations of law that are trivial,

---

[3]    The second part of Section 4(a)(1)(D) requires legislative bodies to repeal objected-to changes so that they could not subsequently be enforced after a jurisdiction bails out or the special remedial provisions of the Voting Rights Act expire.

promptly corrected and not repeated. Section 4(a)(3) has such an exception. Section 4(a)(1)(D)
does not. And since Congress obviously knew how to create an exception such as the one in
Section 4(a)(3), and did not to do so for Section 4(a)(1)(D), no such exception can be read into
the latter.

Section 4(a)(1)(D) is a specific statute addressing Section 5 violations; Section 4(a)(3)
addresses all violations of *any* federal or state or local law relating to discrimination in voting on
account of race or color. Thus, with respect to Section 5 Preclearance Violations (the failure to
get preclearance for changes in voting), Section 4(a)(1)(D) applies and no exception for trivial,
isolated, or any other kind of Preclearance Violations exists. *Radlax Gateway Hotel, LLC v.
Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) ("'[I]t is a commonplace of statutory
construction that the specific governs the general.'") (quoting *Morales v. Trans World Airlines*,
504 U.S. 374, 384 (1992)) (brackets as in *Radlax*). In *Radlax*, the Court held that, where there
was a specific provision addressing cramdown plans involving the sale of secured property in a
Chapter 11 bankruptcy plan free and clear of any liens, that specific provision had to be followed,
and could not be circumvented by a more general provision permitting the secured creditors to
receive the "indubitable equivalent" of their claims. *Id.* The Court explained that the
specific/general rule was designed to implement a separate canon of statutory construction that
militates against interpretations that would render some part of the statute redundant or
superfluous. *Id.*

*Corley v. United States*, 556 U.S. 303 (2009) provides additional insight on this last
canon that is relevant here. Section 3501(a) of the criminal code provides that voluntary

11

confessions are admissible.  Section 3501(c) provided that a voluntary confession made within six hours of arrest is not inadmissible solely because of delay in bringing the person before a magistrate.  *Id.* at 309-10.  The Government in *Corley* argued that a voluntary confession made more than six hours after arrest was nonetheless admissible under Section 3501(a).

The Court rejected that argument.  "The fundamental problem with the Government's reading of § 3501 is that it renders § 3501(c) nonsensical and superfluous. . . .  If (a) really meant that any voluntary confession was admissible, as the Government contends, then (c) would add nothing . . . ."  *Id.* at 314.  In responding to the dissent's argument that 3501(a) was unambiguous, the Court noted that statutes must be read as a whole, and that 3501(a) was clear "only until one reads § 3501(c) and recognizes that if (a) means what it literally says, (c) serves no purpose."  *Id.* at 315 n.5.  Thus, the Court held, Section 3501(c) applied to a question of whether delay in presentment rendered a confession inadmissible.  To the extent that that interpretation presented any conflict with 3501(a), the Court noted that "the conflict is resolved by recognizing that (a) is a broad directive . . . and 'a more specific statute will be given precedence over a more general one.'"  *Id.* at 317 (quoting *Busic v. United States*, 446 U.S. 398, 406 (1980)).

This analysis applies here.  Section 4(a)(3) broadly applies to any violation of any law prohibiting discrimination against voting.  Section 4(a)(1)(D) applies to violations of Section 5.  If the exception in Section 4(a)(3) for certain violations applied to Section 5 violations, then it would always trump the absolute prohibition against bailout, without any exception, for Section 5 violations contained in Section 4(a)(1)(D).  The first part of Section 4(a)(1)(D) would be

12

superfluous.

This is just poor statutory interpretation.  If Congress had wanted an exception to apply for any of the Section 4(a)(1) conditions, including Section 4(a)(1)(D), it would have put them *in Section 4(a)(1)*.  It did not, and this Court must conclude that it did not want any such exception.

The parties offer several additional arguments for their interpretation: first, that the Attorney General has consistently interpreted the Voting Rights Act in this fashion and, second, that this Court has approved consent judgments where there were Preclearance Violations.  Govt. Memo. 16-17; Pl. Memo. 9.  But a consistently wrong interpretation of the statute by the Attorney General does not make it right.  And there is nothing in the cases that the parties cite to suggest that the Court took notice of any Preclearance Violations, much less that the impropriety of the statutory interpretation adopted by the Attorney General was brought to this Court's attention.  And, of course, even if they were precedents on the point in question, they would not be binding.  *In re Executive Office of President*, 215 F.3d 20, 24 (D.C. Cir. 2000) (district court opinions do not establish the law of the district).  These, then, are hardly arguments *against* intervention.  They are arguments that weigh in favor of it here, and suggest that it would have been beneficial in a number of past cases.

Plaintiff offers two additional arguments based upon legislative history: first, that the 1982 Congress specifically understood that certain violations of law would not prevent bailout, and second, that the 2006 Congress understood that bailout had been granted even when there had been Preclearance Violations.  Pl. Memo. 8, 10.  Of course, resort to legislative history

13

cannot trump the hoary canons of statutory interpretation described above, but even if it could, plaintiff's evidence is weak.  It cites no Preclearance Violations from the 1982 Senate Report, Pl. Memo. 8, and that is the only thing at issue here.  No one disputes that Section 4(a)(3) applies to violations of law unrelated to the violations that preclude bailout in Section 4(a)(1).  As to the 2006 legislative history, plaintiff cites its lawyer's own testimony before Congress, and concludes that Congress's decision to leave the bailout provision unchanged must mean that it approved of the bailouts that had transpired in the past.  Pl. Memo. 10.  Of course, if that were the case, it is hard to understand why Congress did not repeal the first part of Section 4(a)(1)(D), which stands (at the very least) in stark tension with the interpretation that the Attorney General favors.  Indeed, its failure to do so could be deemed evidence that it did *not* approve of the Attorney General's practice.  The simplest explanation, though, is that Congress probably did not focus a great deal of attention on Mr. Hebert's testimony.

Finally, even if the parties were correct that Section 4(a)(3) governs Preclearance Violations, that would still leave the question as to whether the Preclearance Violations were trivial, not repeated, and promptly corrected.  Other than various assurances that they were, the parties offer no evidence for this Court to assess that standard.  Indeed, plaintiff claims that Section 4(a)(3) permits this Court to grant the declaratory judgment of bailout in the face of Preclearance Violations "regardless of their number."  Pl. Memo. 7.  This is inconsistent with the statutory text precluding preclearance if the violations were "repeated," and strongly suggests that further examination of the violations would be warranted even if Section 4(a)(3) were applicable. *See also* Pl. Memo. 7 ("a number" of New Hampshire's changes had not been submitted) and 10

(testimony of plaintiff's attorney that DOJ will allow late requests for preclearance at the time bailout is sought when jurisdiction failed to submit "a few" changes).

III.   THE PARTIES' ARGUMENTS AGAINST PERMISSIVE
       INTERVENTION SHOULD BE REJECTED

Since the motion to intervene was made, the parties have submitted a joint motion for entry of a consent decree.  This additional fact, and the papers submitted on this motion, further demonstrate that permissive intervention here would be appropriate and in the interests of justice.

A.   This Court's Independent Duty Militates In Favor Of Permissive Intervention

This Court cannot act as a rubber stamp for the parties' proposed consent judgment.  Both the language of the Voting Rights Act and general principles of law require it to independently assess plaintiff's request for a declaratory judgment.  42 U.S.C. § 1973b(a)(1) ("A declaratory judgment under this section shall issue only if *such Court* [*viz.*, this Court] determines . . . ") (emphasis added), § 1973b(a)(4) (requiring publicizing of "any proposed settlement" and providing that "[a]ny aggrieved party" may intervene), and § 1973b(a)(9) (providing for intervention by "[a]ny aggrieved party" even where the Attorney General has consented to an entry of judgment based upon an independent investigation and a showing of objective and compelling evidence by the plaintiff).  The Act does not instruct this Court to simply take the Attorney General's word as gospel.

This is entirely consistent with general procedures for all consent decrees.  *E.g.*, *Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (prior to approving a

consent decree a court must satisfy itself of the settlement's overall fairness to beneficiaries and consistency with the public interest); *National Ass'n of Home Builders v. Evans*, 2002 WL 1205743, * 2 (D.D.C. 2002) (court has a duty to make an independent judgment before approving any consent order "to assure itself that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against public policy") (quoting *United States v. Hooker* Chemicals, 540 F. Supp. 1067, 1072 (W.D.N.Y.1982)).  A consent decree is a judicial act committed to the informed discretion of a trial court.  *See id.* (citing *Citizens for a Better Environment*, 718 F.2d at 1124 (quoting *United States v. Swift & Co.*, 286 U.S. 106, 115 (1932))).

> Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should, therefore, examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence. This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of record, whether established by evidence, affidavit, or stipulation. If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed.

*United States v. City of Miami*, 664 F.2d 435, 441 (5ᵗʰ Cir. 1981) (en banc).

Thus, even if the decree only affects third parties' non-legal rights, or affects no one else at all, a court must nonetheless carefully review the terms of any consent decree before granting its imprimatur.  *Martin v. Wilks*, 490 U.S. 755, 788 n.27 (U.S. 1989) ("the court reviews the consent decree to determine whether it is lawful, reasonable, and equitable"); *Williams v.*

*Vukovich*, 720 F.2d 909, 920 (6ᵗʰ Cir. 1983) ("Judicial approval . . . may not be obtained for an agreement which is illegal, a product of collusion, or contrary to the public interest"); *In re Masters Mates & Pilots Pension Plan*, 957 F.2d 1020, 1026 (2d Cir. 1992) ("'Even if no third party complains, the judge has to consider whether the decree he is being asked to sign is lawful and reasonable as every judicial act must be'" (quoting *Donovan v. Robbins*, 752 F.2d 1170, 1176 (7th Cir. 1985)); *City of Miami*, 664 F.2d at 440-41 ("The court . . . must not merely sign on the line provided by the parties.  Even though the decree is predicated on consent of the parties, the judge must not give it perfunctory approval"); *American Canoe Ass'n v. EPA*, 54 F. Supp. 2d 621, 629 (E.D. Va. 1999) ("Although [objecting party] makes no specific objection to the fairness, adequacy, or reasonableness of the consent decree, a reviewing court's independent duty of examination requires consideration of these factors.").

In this case, the court's independent duty to review any consent decree must be guided by the statute itself which sets out the criteria under which the court can issue a declaratory judgment permitting a jurisdiction to bail out.  *See Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1125 (D.C. Cir. 1983) (A district court's "authority to adopt a consent decree comes only from the statute which the decree is intended to enforce.") (quoting *System Federation No. 91 v. Wright*, 364 U.S. 642, 651 (1961)).  Thus, this Court must face the statutory interpretation dispute outlined in these papers under any circumstances.

The best way to address it would be through the process of litigation "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

Here, the current parties are not adverse; adverseness can only come by granting this motion.

B.    The Parties' Other Arguments, And *Ad Hominem* Attacks, Should Be Rejected

Defendants assert that movant cannot permissively intervene because he cannot present an "independent ground for subject matter jurisdiction," which it construes as requiring the same standing prerequisites as intervention under Rule 24(a).  Govt. Memo. 13-14.  But "subject matter jurisdiction" is different; it requires only a claim based in federal law, which movant here has.  The plain language of Rule 24 demonstrates that permissive intervention under Rule 24(b) does not require the same "interest" required in Rule 24(a)(2).  *Securities and Exchange Comm'n v. United States Realty & Improvement Co.*, 310 U.S. 434, 459 (1940) (Rule 24(b)(2) "plainly dispenses with any requirement that the intervenor shall have a direct personal or pecuniary interest in the subject of the litigation.").  In any event, as already demonstrated, movant does have Article III standing to protect his procedural rights under Section 5.

Defendants further assert that that intervention will cause undue  delay.  Govt. Memo. 14.  No doubt the parties would like this Court to approve their handiwork as soon as possible.  But a delay that would facilitate this Court's ability to fulfill its independent duty to assess that handiwork – which is the only delay intervention would cause – is not inappropriate.

The parties also claim that movant's real purpose is to undermine Section 5 altogether and that this provides a separate reason to deny permissive intervention.  Govt. Memo. 15; Pl. Memo. 13-14.  Plaintiff is especially insistent on this attribution of motive.  *E.g.*, Pl. Memo. 4 ("The cold fact is that this movant . . . desire[s] to destroy Section 5, not to seek its protection."),

18

5 ("[H]is aim is more likely an effort . . . to bolster claims before the Supreme Court in the *Shelby County* case that Section 5 is unduly burdensome . . . . "), 12 (movant's claim "that he wants to see Section 5 coverage of New Hampshire continued" is "exposed above as implausible"), and 13 (movant "desires Section 5 itself to be nullified").  But the only apparent basis for this attributed motive is that movant's attorneys advocate for clients whose goal is to have Section 5 declared unconstitutional.  *See, e.g.*, Govt. Memo. 15 n.7; Pl. Memo. 2 n.2, 4 & n.5.  (Defendants briefly refer, in addition, to a part of movant's initial memo, Govt. Memo. 15, but that excerpt speaks only to *defendants'* motivation, not movant's.)  Why movant chose a particular set of attorneys is irrelevant to his motion to intervene.

And even if they actually had some basis for attributing that goal to movant, the parties do not explain why the goal of having Section 5 declared unconstitutional at some point in the future, but enforced according to its plain terms before that time, presents any kind of conflict. Far more troubling is defendants' apparent effort to rewrite the Voting Rights Act so that an important provision of the statute is rendered nugatory.

<u>Conclusion</u>

For the foregoing reasons, and the reasons set forth in movant's initial papers, the motion to intervene should be granted.

Respectfully submitted,

<u>/s/ Michael E. Rosman</u>
Michael E. Rosman (DC Bar No. 454002)
Michelle Scott (DC Bar No. 489097)
Center for Individual Rights
1233 20th St. NW Suite 300
Washington, DC 20036
(202) 833-8400

Attorneys for Movant